**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LUKAS G.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 21 C 6529** |
| | ) | |
| **v.** | ) | **Judge Jorge L. Alonso** |
| | ) | |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Lukas G.,[1] seeks judicial review of the defendant Commissioner of Social Security's denial of his application for child's disability insurance benefits, *see* 42 U.S.C. §§ 423, 402(d)(1). For the reasons set forth below, the Court affirms the decision.

## <u>Background</u>

This case arises out of an August 6, 2019 decision, in which an administrative law judge ("ALJ") ruled that plaintiff is ineligible for child's disability insurance benefits, the second such decision rendered against him. The first decision, issued on March 3, 2016, was also the subject of a request for judicial review, which ended with a district court reversing and remanding the decision. After the ALJ rendered another unfavorable decision on remand, which became the final decision of the Commissioner when the Social Security Appeals Council denied review on October 5, 2021, plaintiff filed this lawsuit, seeking reversal and another remand.

---

[1] Pursuant to this district's Internal Operating Procedure 22, the Court refers to plaintiff by his first name and the first initial of his last name.

## I.      Prior Proceedings Before ALJ and On Judicial Review

A child of an individual entitled to Social Security disability insurance benefits, *see* 42 U.S.C. § 423, who is "under a disability . . . which began before he attained the age of 22" and is dependent on the individual, may be entitled to monthly child's insurance benefits. *See* 42 U.S.C. 402(d)(1); *see also* 20 C.F.R. § 404.350(a). To determine whether a claimant is disabled, the Social Security Administration ("SSA") follows a five-step review process, sequentially assessing "(1) the claimant's current work activity; (2) [if none,] the medical severity and duration of the claimant's impairments; (3) whether the claimant's impairments meet or medically equal the requirements of an impairment listed in the regulations; (4) [if not,] whether the claimant has the residual functional capacity ["RFC"] to return to past relevant work; and (5) if the claimant cannot return to past relevant work, whether he or she can 'make an adjustment to other work' in the national economy." *Varga v. Colvin*, 794 F.3d 809, 812 n. 2 (7th Cir. 2015) (citing 20 C.F.R. § 404.1520(a)(4)(i)-(v)).

On January 24, 2014, plaintiff filed an application for child's insurance benefits, alleging disability beginning July 20, 2012, when he was twenty-one years old. After sustaining a head injury in December 2010, plaintiff began to suffer from severe migraines and postural orthostatic tachycardia syndrome ("POTS"). POTS is a condition that causes his heart rate to spike after standing for more than a few minutes, which results in lighheadedness and a drop in blood pressure. *See Garza v. Berryhill*, No. 17 CV 4189, 2018 WL 2765921, at *1 (N.D. Ill. June 8, 2018). After plaintiff's application was denied, both initially and then again upon reconsideration, he requested a hearing before an administrative law judge ("ALJ"). Plaintiff described his symptoms in a March 2014 Function Report and at a February 2017 hearing, when he testified that he needed to keep his

feet elevated while seated because, if he did not, then his POTS symptoms would start. If he stood too long or sat too long without elevating his legs, he would feel his heart rate begin to rise, and then his blood pressure would drop, fatigue and brain fog would set in, blood pooling would begin in his hands and feet, and he would sometimes have rebound symptoms that required him to lie down for days afterwards. Plaintiff claimed to be unable to work or keep up with college coursework, despite accommodations his school's disability office tried to make for him. Supporting this testimony was a May 12, 2015 "Medical Assessment of Condition and Ability to Do Work-Related Activities," in which Dr. Alex Barboi, plaintiff's treating neurologist, opined that plaintiff should keep his feet elevated while sitting to prevent "blood pooling" and "hypotension." *Id.* at *1.

At the hearing before the ALJ, a vocational expert ("VE") testified that, hypothetically, sedentary work is not available to a person who must elevate his legs to knee height, although it might be available to someone who must elevate his legs fifteen inches, or to "stool height." *Id.* at *2. Before the ALJ incorporated the leg-elevation requirement into the hypothetical, the VE had testified that a hypothetical person with plaintiff's other characteristics and restrictions could perform three jobs: telephone quote clerk, charge account clerk, and telephone order clerk. *Id.* On March 3, 2016, following a hearing, the ALJ issued an unfavorable decision, concluding that, although plaintiff suffered from severe impairments, namely, POTS and migraines, he was not disabled because they did not prohibit him from performing sedentary work, provided, among other things, that he could elevate his legs fifteen inches or less.

Plaintiff sought judicial review of the ALJ's decision, and the reviewing district court concluded that the decision was not supported by substantial evidence. *See id.* at *3-4. The ALJ

had included in the RFC the requirement that plaintiff elevate his legs fifteen inches or less during the workday, but the court found no "logical bridge," *id.* at 3 (citing *Steele v. Barnhardt*, 290 F.3d 936, 941 (7th Cir. 2002)), from the evidence before her to this requirement. There was evidence that plaintiff needed to elevate his legs to knee height, and there was evidence that sedentary work was not generally available to a hypothetical individual who needed to elevate his legs higher than fifteen inches, but the ALJ's finding that plaintiff needed to elevate his legs fifteen inches—but not more—neither followed from this evidence nor rested on any other substantial evidence. Additionally, "the VE did not testify whether a leg elevation requirement would erode the job base for the three clerk jobs he identified," and therefore the Court found that the ALJ's conclusion at step five that he could perform those jobs did not rest on substantial evidence. *Id.* at *3 (citing *Sombright v. Astrue*, No. 10 C 2924, 2011 WL 1337103, at *9 (N.D. Ill. Apr. 6, 2011)). The court remanded the case for further proceedings, directing the ALJ to "fully develop the record regarding Plaintiff's need to elevate his legs and the effect of his other POTS symptoms on his day-to-day functioning" and to "consider carefully whether to question Dr. Barboi about Plaintiff's limitations." *Id.* at *4.

## II.     Proceedings On Remand

On remand, the ALJ sought new information from Dr. Barboi. He did not respond to the ALJ's requests, but he did provide plaintiff with a newly completed "Physical Residual Capacity Statement" form in June 2019, in which he answered a number of questions about plaintiff's condition, identifying limitations in his ability to stand, sit, or walk for extended periods of time and a need to lie down for about two hours during the workday. In answer to the form's question, "With prolonged sitting, should your patient's leg[s] be elevated?" Dr. Barboi checked the box for

4

"yes." In answer to the question, "If yes, how high should the leg(s) be elevated?" Dr. Barboi wrote, "chair level." In answer to the question, "what percentage of time during an 8-hour workday should the patient's leg(s) be elevated?" Dr. Barboi wrote, "50%." (Certified Administrative Record ("AR") at 1273, ECF No. 5-1.) He did not elaborate. The ALJ admitted this form into evidence at a July 10, 2019 remand hearing. Another of plaintiff's treating physicians, cardiologist Dr. Jose Nazari, filled out a "Cardiac Impairment Questionnaire" on November 29, 2018, in which he also indicated, among other things, including certain limitations in plaintiff's ability to sit, stand, or walk, that plaintiff's legs should be elevated to chair height while seated. (AR at 915-918.)

The ALJ retained an "impartial medical expert," Dr. Thomas Goldstein, to assist her in assessing plaintiff's impairments. (AR at 570.) At the hearing, Dr. Goldstein testified he had reviewed and considered Dr. Barboi's opinions, including those in the June 2019 statement, and in general he found no objective basis in the medical records for the restrictions Dr. Barboi had identified. Similarly, he found no support for the restrictions identified by Dr. Nazari, which included "limitations of standing, walking and/or sitting 45 minutes." (AR at 571.) Dr. Goldstein explained that any restrictions of this nature were undermined by plaintiff's completion of the Bruce Protocol, a five-stage treadmill stress test for heart health in which the speed and grade is increased every three minutes. For each three-minute stage completed, the patient achieves five "METS," or metabolic equivalents. Plaintiff achieved 18 METS on a December 2017 Bruce Protocol stress test, a result that would be beyond most patients and a significant improvement on the results of his January 2014 Bruce Protocol stress test, when he could only reach stage three. Even a June 2012 exercise EKG stress test had shown that plaintiff's "exercise capacity was excellent." (AR at 295, 303, 336.) Given that, as Dr. Goldstein explained, any "cardiovascular

5

fatigue . . . is evaluated by stress test," and plaintiff performed well on his stress tests, the objective medical evidence did not support exertional restrictions, as long as he could "largely remain seated" at work. (AR at 571.) Dr. Goldstein acknowledged some other restrictions, including the need to avoid exposure to extreme temperatures, unguarded heights, or dangerous machinery, but aside from these few restrictions he considered plaintiff capable of performing sedentary work.

The ALJ gave "great weight" to Dr. Goldstein's opinion (AR at 573), agreeing with him that, while plaintiff had some POTS-related limitations, there was no support in the objective medical evidence for restrictions so severe that they would preclude plaintiff from performing sedentary work. Regarding the elevation of the legs, Dr. Goldstein found no evidence supporting that restriction, and the examination records did not reflect edema (swelling) or substantiate any complaints of blood pooling. As for the other restrictions limiting plaintiff's ability to sit, stand, or walk without lying down, the ALJ agreed with Dr. Goldstein that they were undermined by plaintiff's completion of the Bruce Protocol. The ALJ explained that the objective medical evidence did not show that plaintiff could not sit for at least six hours and stand or walk for two, or that he had any exertional impairments or concentration deficits inconsistent with sedentary work. Indeed, the ALJ noted that, between part-time online college coursework and physical therapy, plaintiff was "spending seemingly close to 40 hours per week in some activity, even if partially sedentary." (AR at 572.) Therefore, she concluded that plaintiff had the RFC to perform sedentary work, so long as he was only occasionally required to balance, stoop, kneel, crouch or crawl; not required to climb ladders, ropes or scaffolds; and never exposed to unprotected heights, moving dangerous machinery, or temperature extremes. Based on the VE's testimony that

6

significant work existed in the national economy for someone with plaintiff's RFC, the ALJ concluded that plaintiff was not disabled.

## Discussion

When the Social Security Appeals Council denies an unsuccessful DIB applicant's request for review, "the ALJ's decision becomes the final decision of the [Commissioner]." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The claimant may seek review of a final decision in a federal district court, which may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The reviewing court's role is "extremely limited." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). The Court "may reverse the Commissioner's final decision only if it is not supported by substantial evidence or is based on a legal error." *Hopgood v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003) (noting that "[t]his is a deferential but not entirely uncritical standard, for the Commissioner's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues" (internal citations omitted)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted). Reviewing courts must not reweigh the evidence or substitute their judgment for the ALJ's; they are limited to "review[ing] the ALJ's decision to determine whether it reflects an adequate logical bridge from the evidence to the conclusions." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). This review is "limited to the reasons articulated by the ALJ in her decision." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "A decision denying

benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded." *Id.*

In support of remand, plaintiff argues that the ALJ made the following errors: (1) she did not give controlling weight to the opinions of the treating physicians; (2) she did not properly evaluate plaintiff's subjective statements about his symptoms; and (3) she did not adequately consider plaintiff's non-exertional impairments.

## I.  Weight Given to Treating Physicians' Opinions

Under the regulation applicable here,[2] a "treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is consistent with other evidence in the record." *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (citing 20 C.F.R. § 404.1520c). The regulation gives more weight to the opinions of treating physicians "because they are most familiar with the claimant's conditions and circumstances." *Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016).

If the SSA determines that the opinion of a treating physician is not entitled to controlling weight, then it "must determine what weight it merits by considering the following factors: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; and (4) the consistency and supportability of the opinion." *Jacklin D. v. Kijakazi*, No. 19 C 2361, 2022 WL 797049, at *2-3 (N.D. Ill. Mar. 16, 2022) (citing 20 C.F.R. §

---

[2] 20 C.F.R. § 404.1527 applies in all cases, including plaintiff's, in which the claimant filed his application prior to March 27, 2017. That regulation has since been superseded by 20 C.F.R. § 404.1520c, which jettisons the treating physician rule and dispenses with the need to determine where medical opinions fit in a "perceived hierarchy of medical sources" or how much "weight" to assign them. *See Kelly v. Kijakazi*, No. 3:21CV176, 2022 WL 633313, at *3 (N.D. Ind. Mar. 4, 2022). But the newer regulation only applies if the claimant filed his application *after* March 27, 2017.

404.1527(c)); *see Gerstner*, 879 F.3d at 263. The regulation requires the SSA to give "good reasons . . . for the weight" it assigns to a treating source's medical opinion, if it does not give the opinion controlling weight. 20 C.F.R. § 404.1527(c)(2). If the SSA "discounts the [treating] physician's opinion after considering these factors," the decision must stand "so long as the ALJ 'minimally articulated' his reasons—a very deferential standard," even a "'lax'" one. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (quoting *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)) (internal alteration marks omitted).

Plaintiff argues that the ALJ erred by placing "great weight" on the opinions of Dr. Goldstein, a non-treating source, rather than giving controlling weight to the opinions of Dr. Barboi and Dr. Nazari, which required plaintiff to elevate his legs to chair height and imposed other restrictions. According to plaintiff, the ALJ should not have relied on Dr. Goldstein's specialty in internal medicine (which, plaintiff claims, makes him more of a "generalist" (Pl.'s Mem. at 10, ECF No. 6)) or on his "significant practice history" (AR at 573), when the specialties of Dr. Barboi, a neurologist, and Dr. Nazari, a cardiologist, make them equally, if not more, qualified to assess the extent of plaintiff's limitations. Additionally, plaintiff argues that the ALJ's reasons for placing great weight on Dr. Goldstein's testimony are incoherent: Dr. Goldstein recognized that plaintiff's POTS prevented him from being on his feet all day, so it is unclear, according to plaintiff, why he also rejected the leg elevation requirement and other limitations identified by Drs. Barboi and Nazari, which also stemmed from his POTS. Further, plaintiff finds fault in the ALJ's acceptance of Dr. Goldstein's testimony that plaintiff could prevent blood pooling in his legs without elevating them by instead wearing compression stockings, which, plaintiff argues, has "no support in the record." (Pl.'s Mem. at 11.) The ALJ accepted Dr. Goldstein's reliance on plaintiff's completion

of the Bruce Protocol to support his opinion that Dr. Barboi and Dr. Nazari's limitations were not necessary, but, plaintiff argues, plaintiff's general cardiac fitness was beside the point. Similarly, plaintiff argues, the ALJ should not have relied on physical therapist Denise Poy's assessment of plaintiff's ability to sustain a medium level of physical activity. According to plaintiff, these data do not lessen the seriousness of plaintiff's POTS symptoms, which were the basis for Dr. Barboi and Dr. Nazari's opinions, and the ALJ had no basis for concluding that plaintiff's POTS did not justify the restrictions Dr. Barboi and Dr. Nazari imposed.

These arguments amount, however, to an invitation to reweigh the evidence, which the Court may not do. *See L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1153 (7th Cir. 2019); *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). To begin with, the ALJ adequately explained why she placed little weight on Dr. Nazari and Dr. Barboi's opinions: she agreed with Dr. Goldstein that the objective medical evidence did not support them. Most of the restrictions—those concerning plaintiff's need to lie down, exertional limitations, etc.—were undermined by plaintiff's successful performance on the cardiac stress tests, especially the most recent one, the December 2017 Bruce Protocol stress test, which plaintiff completed with flying colors. And the records of the treating physicians' examinations of plaintiff did not reflect consistent findings of edema justifying the leg-elevation requirement.

The treating physician opinions that plaintiff urges the Court to rely on were all rendered in a questionnaire format (Pl.'s Mem. at 11 (citing AR at 463-68, 915-918, 1271-1274)), without elaboration or citation to particular clinical findings or examinations of plaintiff. Courts have recognized that an ALJ may place limited weight on opinions of this nature when they are inconsistent with or unsupported by the objective medical evidence. *See Dixon v. Massanari*, 270

10

F.3d 1171, 1177-78 (7th Cir. 2001) (substantial evidence supported ALJ's conclusion that treating physician's opinion was not controlling when physician simply wrote "yes" in reply to a pre-typed question, without providing basis or context); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Flynn v. Astrue*, 563 F. Supp. 2d 932, 945 (N.D. Ill. 2008); *see also Marilyn C. v. Kijakazi*, No. 20 CV 1816, 2023 WL 1862988, at *12 (N.D. Ill. Feb. 9, 2023) ("An ALJ does not err when she denies a treating physician's opinion controlling weight when the physician does not explain or offer supporting evidence for the opinion.") (in *dicta*, explaining that treating physician's opinion would not be entitled to controlling weight even if 20 C.F.R. § 404.1527 applied, although the regulation did not apply because the plaintiff's application was filed after March 2017). By explaining that the opinions of Dr. Nazari and Dr. Barboi were not supported by the objective medical evidence, the ALJ provided a sufficient basis for her conclusion that they were not entitled to much weight, let alone controlling weight.

Plaintiff contends that Dr. Goldstein and the ALJ did not have enough information to reject plaintiff's treating physicians' opinions because those physicians' opinions were based on only a few visits, but that is precisely one of the reasons why they are entitled to little weight. *See Scheck v. Barnhart*, 357 F.3d 697, 702–03 (7th Cir. 2004). One of the conditions for giving a treating physician's opinion controlling weight is that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 404.1527(c)(2), and, if the opinion does not qualify for controlling weight, the supportability of the opinion and whether it is based on data gleaned from frequent examinations are factors that affect the amount of weight it should receive. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will

give to the source's medical opinion."); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). In this case, the treating physicians' opinions were supported by limited medical evidence gleaned from few visits, and the ALJ did not err in placing limited weight on these opinions as a result.

As for her decision to place greater weight on Dr. Goldstein's opinion, here, too, the ALJ's explanation was sufficient. First, plaintiff argues that the ALJ placed undue importance on the fact that Dr. Goldstein was licensed in internal medicine, but the Court is not convinced. Plaintiff takes one element of the ALJ's reasoning and blows it out of proportion. What the ALJ wrote was the following:

> The undersigned gives great weight to the opinions of medical expert Dr. Goldstein. Dr. Goldstein has been qualified as an expert, he is a specialist in the field of internal medicine and he has a significant practice history (22F). He has reviewed the claimant's records, he listened to testimony, and he is also familiar with the rules surrounding the Social Security disability process, particularly the requirements of the physical listings. There have been no objections to his qualifications and his opinions are consistent with the objective evidence as a whole, including the diagnostic reports and clinical findings, which he set forth in great detail above along with and referenced exhibits.

(AR at 573.) The ALJ mentioned the fact that Dr. Goldstein was a doctor who specialized in internal medicine, but the Court does not read his specialty to have been a particular focus of the ALJ's analysis. She was simply pointing out that Dr. Goldstein was qualified by his background, training, and experience to review medical evidence and understand its import in the context of plaintiff's application for benefits. Further, by testifying at the hearing, he was able to explain his opinions in some detail and cite the evidence (or lack thereof) to support them, which made his opinions more helpful in the context in which they would be used. *See* 20 C.F.R. § 404.1527(c)(3)

("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). The ALJ did not err by placing weight on Dr. Goldstein's opinions on these grounds.

Next, plaintiff argues that Dr. Goldstein's reasoning is incoherent and unsupported to the extent that he recognized that plaintiff suffered from POTS but rejected the restrictions that, according to Dr. Barboi and Dr. Nazari, flowed from that diagnosis. It is plaintiff's reasoning, not Dr. Goldstein's or the ALJ's, that is flawed in this regard, however, because "a diagnosis does not equate to a disability." *Sonji L. v. Kijakazi*, No. 19 C 4109, 2022 WL 672741, at *5 (N.D. Ill. Mar. 7, 2022) (citing *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998)) ("It is not enough to show that she had received a diagnosis of fibromyalgia . . . , since fibromyalgia is not always (indeed, not usually) disabling."); *see Depies v. Saul*, No. 18-C-1794, 2019 WL 13155076, at *16 (E.D. Wis. Oct. 3, 2019) ("The mere diagnosis of an impairment does not establish its severity.") (citing *Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005) ("There are numerous leaps of logic involved in this argument that diminish its effectiveness as a vehicle for undermining the ALJ's conclusion. Even assuming the accuracy of Schmidt's unsupported contention that some persons with IBS may experience fatigue, this does not mean that Schmidt suffers this symptom; the ALJ was correct in noting that there is no objective support in the medical records for Schmidt's contention that he suffers from IBS-related fatigue.")). A physician's medical opinion is not incoherent because he accepts a diagnosis but disagrees with other physicians about the severity of the impairments the condition causes; indeed, the severity of a claimant's impairments is a common subject in cases involving Social Security disability insurance benefits. *See, e.g.*, *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("The issue in the case is not the

existence of these various conditions of hers but their severity and, concretely, whether . . . they have caused her such severe pain that she cannot work full time."); *Johnson v. Colvin*, No. 14 CV 8425, 2016 WL 4479555, at *7 (N.D. Ill. Aug. 25, 2016); *see also Patricia T. v. Saul*, No. 19 CV 614, 2020 WL 2767580, at *6 (N.D. Ill. May 28, 2020) ("a diagnosis is insufficient to show that a limitation is severe") (citing *Richards v. Berryhill*, 743 F. App'x 26, 30 (7th Cir. 2018)). Here, the ALJ explained that she found the treating physicians' opinions purporting to identify certain limitations to be unsupported by the objective medical evidence, without finding that the underlying diagnosis was unsupported by the medical evidence, and the Court fails to see the facial deficiency in that reasoning that plaintiff purports to find there. *See Jill A. W. v. Kijakazi*, No. 20 C 3854, 2022 WL 225879, at *3-4, 8 (N.D. Ill. Jan. 26, 2022) (affirming ALJ's decision to rely on impartial medical expert's opinion rather than a "Work Status Sheet" form filled out by Dr. Barboi because Dr. Barboi's opinion was not supported by the objective medical evidence); *Cheryl P. v. Kijakazi*, No. 20 CV 2665, 2022 WL 16780930, at *4 (N.D. Ill. Nov. 8, 2022).

Similarly, plaintiff argues that the ALJ erred by relying on Dr. Goldstein's opinion that plaintiff's successful completion of the Bruce Protocol stress test shows that the limitations Dr. Barboi and Dr. Nazari identified were unnecessary and any danger of blood pooling or edema could be offset by wearing compression stockings. According to plaintiff, his "cardiac fitness" (Pl.'s Mem. at 12) did not undermine his POTS diagnosis, and there was no "support in the record" for wearing compression stockings. But plaintiff misses the point: Dr. Goldstein explained that "cardiovascular fatigue . . . is evaluated by stress test," and plaintiff's successful completion of the Bruce Protocol stress test showed that he was not in a condition that would cause fatigue that would justify the kind of restrictions Drs. Barboi and Nazari would have imposed. Physical

therapist Denise Poy's opinion that plaintiff could perform a medium level of physical activity bolstered this conclusion.[3] As for whether the risk of blood pooling or edema could be offset by wearing compression stockings, the suggestion is supported by the record, contrary to plaintiff's suggestion, to the extent that the medical records do not show that blood pooling or edema were a major problem for plaintiff. In fact, it appears that plaintiff *was* wearing compression stockings, according to some of his medical records (*see* AR at 563, 566, 567, 568, 571), and it seemed to help, as plaintiff admits in his opening brief (Pl.'s Mem. at 12 ("[The ALJ] relied upon her assertion that 'most' examinations reflected no edema and few complaints of pooling. One can only assume this is because Plaintiff was taking measures to avoid these problem[s].").). The Court sees no basis for plaintiff's objection that the use of compression stockings lacks support in the record; they came up frequently in the record, Dr. Goldstein's training and experience qualified him to opine on their effectiveness, and the ALJ was entitled to rely on his opinion.

In summary, the ALJ met the burden of minimally articulating substantial evidence supporting her decision not to give controlling weight to the treating physicians' opinions and to place greater weight on the opinion of Dr. Goldstein. *See Jill A.*, 2022 WL 225879, at *3-4; *Judah D. v. Kijakazi*, No. 19 C 7439, 2022 WL 4182382, at *9 (N.D. Ill. Sept. 13, 2022).

## II.    Symptom Evaluation

The SSA evaluates a claimant's symptoms in what is essentially a two-step process. First, the SSA determines whether there is "objective medical evidence from an acceptable medical

---

[3] Plaintiff takes issue with the ALJ's reliance on Ms. Poy's opinion to the extent she limited her opinion to what plaintiff could do in a two-hour period, but the issue is beside the point: there is no dispute that plaintiff was limited to sedentary work, so what physical activity he could perform for a period of longer than two hours is neither here nor there.

source" showing that the applicant has a "medical impairment(s) which could reasonably be expected to produce the pain or other symptoms." 20 C.F.R. § 404.1529(a). The SSA defines objective medical evidence as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2). If there is such evidence, then the SSA proceeds to the second step, in which it "evaluate[s] the intensity and persistence" of the applicant's symptoms in order to "determine how [they] limit [the applicant's] capacity for work." 20 C.F.R. § 404.1529(c)(1); *see* SSR 16-3p, 2016 WL 1119029, at \*4-5 (SSA Mar. 16, 2016); *see also Evaluation of Symptoms In Disability Claims*, 82 Fed. Reg. 49462-03, 2017 WL 4790249 (SSA Oct. 25, 2017).

At this second step, the SSA begins with the objective medical evidence, but it does not rely on it exclusively, as "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." SSR 16-3p, 2016 WL 1119029, at \*5. The agency must consider all record evidence from "medical sources or nonmedical sources," 20 C.F.R. § 404.1529(c)(3), and it "evaluate[s] [the applicant's] statements," including "statements about the intensity, persistence, and limiting effects" of his symptoms, "in relation to the objective medical evidence and other evidence" to determine whether he is disabled. 20 C.F.R. § 404.1529(c)(4). In doing so, the ALJ considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the applicant's] statements and the rest of the evidence, including [the applicant's] history, the signs and laboratory findings, and statements by . . . medical sources or other persons about how [the applicant's] symptoms affect [him]." *Id.*

The SSA may not "reject [the applicant's] statements about the intensity and persistence of [his] pain and other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [his] statements." 20 C.F.R. § 404.1529(c)(2); *see* SSR 16-3p, 2016 WL 1119029, at *5 ("[W]e will not disregard an individual's statements about the intensity, persistence and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual.") "If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, [the SSA] will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities." SSR 16-3p, 2016 WL 1119029, at *7. "In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities" *Id.*

Plaintiff stated in his Function Report and hearing testimony that he needed to elevate his legs while seated to prevent POTS symptoms from starting and he was unable to keep up with schoolwork, despite accommodations made by the school, due to fatigue and brain fog. The ALJ stated the following, in relation to plaintiff's subjective statements about his symptoms:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent. The claimant has alleged greater limitations in his testimony and *Function Reports* than were described in his reports to his physicians. He was advised to engage in an exercise regime. He also reported he was managing his symptoms with exercise and diet. The claimant has made some reports of fatigue and memory loss/fog when seen by Dr. Barboi in January 2013. However, the claimant's examination in January 2013 demonstrated normal attention span, concentration and intact memory. The claimant's March

2013 examination with Dr. Barboi suggested increased fatigue was caused by Bisoprolol, which the claimant stopped. The claimant's mental status examination was unremarkable (4F/2, 4-6 5F/12). The claimant denied fatigue and malaise in a visit with Dr. Nazari (24F/121). The next examination with Dr. Barboi was after the claimant turned 22 was on August 5, 2013, at which time the claimant's mental examination was unremarkable. The claimant reported being stable and did not report fatigue. As Dr. Goldstein noted, the claimant's December 28, 2017 stress testing was "*above normal*" (120-140%) age expected functional aerobic capacity. Moreover, the claimant reported having an active lifestyle (24F/113). Records showed that as of January 2019, the claimant was exercising 30-40 minutes cardio 3-4 times a week and 3-4 times a week strength training (24F/254).

(AR at 570.) The ALJ went on to summarize Dr. Goldstein's testimony concerning the various medical evidence before returning to plaintiff's own statements:

> The undersigned concludes that, while there is an objective basis for the claimant's symptoms in the medical evidence, there is not sufficient objective support for the consistency, frequency, or the symptom level that he alleges he has. The lack of supportive objective findings on longitudinal examinations to support alleged disability renders his subjective reports inconsistent with and grossly disproportional to the objective medical evidence and other evidence in the record.

> The undersigned finds sufficient evidence that the claimant could not sustain more than sedentary work due to his POTS and migraine headaches. The claimant did have some headaches but testified they were not a persistent problem according to the records. The claimant was diagnosed with POTS and has some findings consistent [with] that condition, but not usually shortness of breath, diminished strength or sensation, or restricted ranges of motion, and nothing that would preclude lifting/carrying 10 pounds occasionally and up to 10 pounds frequently on a sustained basis. There is insufficient evidence that supports a residual functional capacity to stand/walk for less than two hours, and nothing that would preclude sitting six hours. He has returned to school part-time 6-9 hours per semester and does pretty well in class. He admitted to doing a part-time physical therapy program, 4 hours a day, 3 days a week and has classes all 5 days per week. The undersigned notes that even if the claimant is attending school online (video, skype), the claimant is spending seemingly close to 40 hours per week in some activity, even if partially sedentary. The claimant testified about needing to lie down after exercise and headaches interfered but the records do not generally reflect he reported this complaint at any great length. Further restrictions are warranted to prevent exacerbations or trigger symptoms and in the interest of safety. The claimant could never climb ladders, ropes, or scaffolds. However, he could perform less strenuous postural activity including stairs and ramps occasionally, occasionally balancing, stooping, kneeling, crouching, and crawling. In addition, the claimant should avoid all exposure to unprotected heights and moving

> dangerous machinery to avoid danger. He should avoid extreme heat and humidity and work in indoor/temperature controlled work environments to avoid triggers and symptoms.

(AR at 572.) Therefore, the ALJ concluded that plaintiff's "subjective statements are consistent with the presence and persistence over time of his impairments, but the medical record simply does not support the allegation that the claimant would have limitations" great enough to prevent him from performing sedentary work. (AR at 575.)

Plaintiff argues that the ALJ cherry-picked evidence that was unfavorable to him and ignored evidence that supported his position. Specifically, he contends that defendant seizes on medical records documenting physician visits on days when plaintiff was feeling fairly well, while ignoring other evidence. According to plaintiff, this mode of analysis does not accurately reflect the experience of someone suffering from a "chronic and complex condition," who is "likely to have good days and bad days"—for such a person, the bad days may seem few and far between, but still occur often enough to prevent him from holding down a full-time job. *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).

Plaintiff does not cite medical evidence to demonstrate that his POTS-related issues are episodic in the way that, for example, bipolar disorder is, as described in the *Bauer* case that he relies on. *See id.* But even if the Court assumes that the analogy to *Bauer* and like cases is a fair one, it is not enough for plaintiff to point out that the ALJ did not exhaustively "address every fact in the record." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022). "[A]n ALJ doesn't need to address every piece of evidence, but he or she can't ignore a line of evidence supporting a finding of disability." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021). "So long as an ALJ gives

specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Id.* (internal quotation marks omitted).

Here, not only did the ALJ not ignore an entire line of evidence, she did not ignore the specific evidence that plaintiff cites. Plaintiff cites certain medical records, claiming that they demonstrate that his "heart rate remained tachycardic" in "September 2014 and again in June 2017." (Pl.'s Mem. at 14.) These isolated moments do not convince the Court that the ALJ was patently wrong in concluding that his tachycardic or otherwise POTS-related episodes were not so frequent as to prevent him from holding down a job. *Grotts*, 27 F.4th at 1279; *see Stephanie H. v. Comm'r of Soc. Sec.*, No. 20 C 4600, 2021 WL 2986298, at *5-6 (N.D. Ill. July 14, 2021) ("While the plaintiff tendentiously characterizes the ALJ's view of the record as "skewed," in truth, it is the plaintiff's view – which ignores the fact that the vast majority of the medical evidence is unremarkable – that is skewed. . . . [T]he medical record is what it is and cannot be ignored: examination after examination with mostly normal results. A plaintiff can't apply for benefits and dismiss the bulk of her medical record as insignificant.") (internal citation omitted). Regardless, the ALJ did not ignore this evidence; she discussed these episodes, these records, and these physician encounters. (AR at 567-68). By asking the Court to reject her conclusion, plaintiff simply invites the Court to reweigh the evidence, which it may not do. *Grotts*, 27 F.4th at 1279; *see Nicole M. v. Kijakazi*, No. 21 C 6441, 2023 WL 2138767, at *5 (N.D. Ill. Feb. 21, 2023) (concluding that the ALJ "did not ignore that [the plaintiff] had good days and bad days"; instead the ALJ "found that the evidence as [a] whole" showed that her condition was under "control[]" such that it did not preclude her from working).

Although it might appear at first glance that the ALJ's unfavorable decision was based on a finding that objective medical evidence did not substantiate plaintiff's symptoms, which would be improper, *Cheryl T. v. Kijakazi*, No. 20 C 6960, 2022 WL 3716080, at \*5, \*7 (N.D. Ill. Aug. 29, 2022), a closer reading shows that the decision was based instead on a finding that plaintiff's subjective statements about his symptoms were inconsistent with and even in conflict with the medical evidence, which is a different proposition. *See Cheryl P. v. Kijakazi*, No. 20 CV 2665, 2022 WL 16780930, at \*6 (N.D. Ill. Nov. 8, 2022) (ALJ's conclusion concerning subjective symptom statements was not patently wrong where ALJ found that the subjective symptom statements were "at odds with" certain medical evidence, and the totality of the medical evidence was "inconsistent with" and "conflicted with" the plaintiff's statements about the severity of her symptoms); *see also Gwendolyn M. v. Berryhill*, No. 17 CV 7900, 2019 WL 2208306, at \*8 (N.D. Ill. May 22, 2019) (explaining that a "'lack of objective support from physical examinations and test results' remains relevant to the ALJ's assessment," and "the treatment record as a whole . . . support[ed] the ALJ's subjective symptom analysis) (quoting *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014)); *Aimee U. v. Kijakazi*, No. 2:21-02024-CSB-EIL, 2022 WL 16707281, at \*2 (C.D. Ill. July 5, 2022); *Rodolfo G. v. Kijakazi*, No. 19 CV 3937, 2022 WL 507589, at \*10 (N.D. Ill. Feb. 18, 2022) ("Here, the treatment record as a whole, including Claimant's minimal contemporaneous complaints to his treating physicians, supports the ALJ's subjective symptom analysis.") (citing *Jens v. Barnhart*, 347 F.3d 209, 212-13 (7th Cir. 2003)). As in the above-cited cases, the ALJ properly considered the record as a whole, discussing the evidence at length, and determined that, on balance, the medical evidence in the treatment record was inconsistent with

plaintiff's subjective statements. The Court cannot say that her conclusion was patently wrong or unsupported by substantial evidence.

### III.    Non-Exertional Mental Impairments

Plaintiff argues that the ALJ ignored evidence of his non-exertional mental impairments, namely, his anxiety, fatigue, brain fog, headaches, dizziness, and resulting deficits in concentration. While she discussed these impairments at step 2 of the five-step process, in assessing plaintiff's impairments, she did not discuss them again during her RFC analysis, which, plaintiff, contends, was error.

The Court "reads the ALJ's decision as a whole," and the ALJ "need not repeat analyses that are relevant to multiple parts of [her] decision." *Dorothy B. v. Berryhill*, No. 18 CV 50017, 2019 WL 2325998, at *4 (N.D. Ill. May 31, 2019) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004)). The ALJ discussed these impairments and their severity in some detail at step 2, and there was no reason she had to reiterate that fulsome discussion at later stages of the opinion. *See Patricia T.*, 2020 WL 2767580, at *6 (relying on ALJ's "in-depth explanation" of limitations in "concentration" at step two in ruling that ALJ had adequately explained reasons for her subsequent RFC assessment) (citing *Richards*, 743 F. App'x at 30); *Kathleen C. v. Saul*, No. 19 CV 1564, 2020 WL 2219047, at *6 (N.D. Ill. May 7, 2020) ("The fact that each element of the record was discussed individually by the ALJ hardly suggests that the totality of the record was not considered, [and] [a]lthough the ALJ might have drafted a cleaner decision by including the word "depression" directly in her Step Three analysis, the Court does not find this a remandable error.").

As the Court explained in the preceding section of this Opinion, the ALJ discussed all of the evidence, including the evidence that on numerous occasions plaintiff reported to treating physicians that fatigue and other such symptoms were slight and he was engaged in productive activity at school and physical therapy, and she concluded that, on balance, the inconsistency of much medical evidence with plaintiff's subjective statements about these symptoms weighed against him. There is nothing unusual about this finding or deficient in the reasoning. *See Felts v. Saul*, 797 F. App'x 266, 270 (7th Cir. 2019) ("Felts's claim that he suffered serious concentration problems was undermined by evidence that he was able to perform many other activities."); *Betty J. v. Saul*, No. 18 C 5457, 2020 WL 2557348, at *6 (N.D. Ill. May 20, 2020) (ALJ did not err by relying on medical records of "mostly normal physical examinations") (citing *L.D.R.*, 920 F.3d at 1152-53). Again, plaintiff's position boils down to an invitation to reweigh the evidence, and that is something this Court may not do. *Kathleen C.*, 2020 WL 2219047, at *6. The ALJ more than minimally articulated her decision based on substantial evidence, and the Court detects nothing patently wrong in her findings.

## <u>Conclusion</u>

For the reasons set forth above, the Court grants defendant's motion for summary judgment [10] and affirms the decision of the Commissioner. Plaintiff's application to proceed *in forma pauperis* [13] is granted. Civil case terminated.

**SO ORDERED.**                                   **ENTERED:   February 28, 2023**

_____

**HON.  JORGE L. ALONSO**
**United States District Judge**